FILED
2019 Jun-25  PM 02:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **GLENDA HINTON,** ) | |
| ) | |
| **PLAINTIFF,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | _____ |
| **THE LINCOLN NATIONAL** ) | |
| **LIFE INSURANCE** ) | |
| **COMPANY,** ) | |
| ) | |
| **DEFENDANT.** ) | |

## <u>COMPLAINT</u>

Plaintiff Glenda Hinton ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by The Lincoln National Life Insurance Company ("Lincoln") in connection with the provision of ERISA-governed disability benefits under a group insurance plan sponsored by Plaintiff's former employer, The Cato Corporation. In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to herself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys:

1

## INTRODUCTORY STATEMENT

1.     This is an action for statutorily authorized reliefs seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA").  This suit is brought pursuant to 29 U.S.C. § 1132(a) to secure disability benefits due to Plaintiff through the group insurance policies sponsored by Cato Corporation and to enforce her rights under the Cato Corporation plan.

2.     The Plaintiff seeks all benefits to which she may be entitled should this Court determine she is "disabled," including long-term disability benefits and group life waiver of premium benefits under policies issued or administered and underwritten by Lincoln.

3.     Plaintiff seeks such benefits together with any other disability-related benefits her plan may provide based on the conditions documented in her medical records.  These conditions include low back pain; foraminal stenosis, bulging discs, and degenerative disc herniation and collapse at L4-L5 with a grade I spondylolisthesis and stenosis; spinal enthesopathy; left shoulder impingement and acromioclavicular arthralgia; hypothyroidism; hypertension; and pre-diabetic glucose intolerance.

2

4.    The primary condition affecting Plaintiff's ability to continue working is that emanating from the continued deterioration of her lumbar and cervical spine, which caused her intractable pain, significantly decreased stamina, and the resulting impact of the her pain management regimen which together impact her ability to mentally and physically sustain a fulltime work schedule, whether as a retail store manager or in any other capacity at all.

## JURISDICTION

5.    Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" as that term is defined within 29 U.S.C. § 1001, et. seq. The Plan "may be found" within this district.

6.    Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

7.    Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue

3

was at least partly administered in this District and Defendant may be found or resides in this District.

## PARTIES

8.    Plaintiff Glenda Hinton is a participant in the Plan and thus entitled to benefits available thereunder.

9.    Defendant The Lincoln National Life Insurance Company ("Lincoln") is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

10.    Lincoln is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

11.    One of Lincoln's designated agent for service of process is:

The Lincoln National Life Insurance Company
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

12.    Lincoln is an entity exercising authority or control respecting the management or disposition of Plan assets or the personnel exercising said authority over Plan assets.

13.    Lincoln is an entity providing services to The Plans at issue.

14.    Lincoln is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

4

## THE PLAN

15.   The Cato Corporation Welfare Benefit Plan provides for a variety of benefits for Cato employees.  Such benefits include long-term disability income protection and life insurance benefits.

16.   The Cato Corporation Plan relies on group insurance policies sold by Lincoln, and which Lincoln underwrites, to fund these benefits.

17.   These group policies were purchased by Cato Corporation to confer these benefits upon Plaintiff and other employees.

18.   These policies and insurance certificates, together with the Cato Corporation Welfare Benefit Plan, qualify as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under the Plan as that term is used in 29 U.S.C. § 1132.

19.   Under the terms of the Cato Plan documents providing for certain benefits accruing upon the Plaintiff becoming disabled, Plaintiff is "disabled" as the Plan documents define that term.

## LINCOLN'S LIABILITY

20.   Almost all of Plaintiff's working life since graduating Valley High School in Valley, Alabama in 1985 has involved fashion retail.  This

5

livelihood eventually brought her to Cato Corporation in 2007 as a store manager where she continued to work among different store locations until 2017 when she injured herself while moving merchandise at a store in Birmingham, Alabama. Around the same time she sustained this injury, she also experienced sharply increased problems with her back that were unrelated to that injury.

21. Plaintiff had a history of pain and discomfort in her back going back several years, but it was at this point in time that this pain and discomfort worsened significantly. While her shoulder injury at work initially limited what she could do, the reason she ultimately was not able to return to work at all was because of her back.

22. In August 2017, Plaintiff's back pain was so severe that she felt compelled to seek emergency care at Brookwood Medical Center. She was given a shot of narcotic pain medication, a prescription for tramadol, and was referred to an orthopedist.

23. One week later, Plaintiff underwent an MRI that showed degenerative changes in her spine, as follows:

L4-5 disc bulge and endplate bar produces moderate left and mild right foraminal stenosis.

L5-S1 small disc bulge produces mild left lateral foraminal stenosis. Modest bilateral facet hypertrophy.

**IMPRESSION:**
1. L4-S1 left eccentric disc bulges
2. Early lower lumbar facet hypertrophy
3. No focal disc protrusion or herniation seen

24.    This was around the same time Dr. James Abroms with Grandview Medical Group, who also was treating Plaintiff, observed Plaintiff to be in so much pain that he concluded it explained her elevated blood pressure during an August 10, 2017 examination.

25.    Throughout this time, Plaintiff reported "significant low back pain" and "tingling in both legs."   These observations of her pain continue throughout Dr. Abroms's examination records where she reports pain at 9 or a 10 out of a scale of 10 at her appointments.

26.    Plaintiff saw Dr. Stephen Nichols at St. Vincent's in late 2017, around the same time she also again sought emergency care at Brookwood for an additional time because of her pain. Dr. Nichols noted Plaintiff's report that she had been experiencing low back pain in her buttocks and legs since that June.  She referenced the epidural injection from Dr. Carr but noted that it did not help her.  He also noted her continued complaint of "pain with prolonged sitting and well as standing and walking. She has difficulty shopping and also sleeping as well as

daily activities." He also noted her worsening pain.

27.   An x-ray and MRI confirmed a collapse at L-4-5 with anterior traction spurs and facet arthrosis, as Lincoln's own claim notes recognized.

28.   Dr. Nichols found Plaintiff's case to be appropriate for the scheduling of surgery to fuse her spine, but when he attempted to schedule the surgery after she completed an unsuccessful round of physical therapy at TherapySouth, Plaintiff's health insurance carrier Cigna denied coverage.

29.   Plaintiff was not able to pay for the surgery out of her pocket in the absence of coverage, so the surgery did not occur.  Dr. Nichols supported Plaintiff's inability to resume working at that time if she could not perform her job without being on her feet for lengthy stretches of time.

30.   Dr. Frank Spain Hodges, an orthopedist, saw Plaintiff in March 2018 at Dr. Nichols's suggestion since Cigna had denied coverage for the spinal fusion he had recommended.  Dr. Hodges confirmed that she suffered from disc space narrowing, facet arthropathy, and broad-based disc bulging.  A March 15, 2018 MRI showed the following:

Findings:
Modic endplate degenerative change L4-L5 is seen. Conus is within normal limits. The paravertebral soft tissues are within normal limits

The T12-L1 level is within normal limits
The L1-L2 level is within normal limits
The L2-L3 level is within normal limits
The L3-L4 level shows a mild broad-based disc bulge facet hypertrophy with mild bilateral neural foraminal encroachment.
The L4-L5 level shows a broad-based disc bulge facet hypertrophy with moderate bilateral neural foramen encroachment
The L5-S1 level shows facet hypertrophy  Mild bilateral neural foramen encroachment is seen

CONCLUSION:

1. Multilevel degenerative changes as described above

31.   Dr. Hodges's observation of Plaintiff's  demonstrable pain behavior at that time included her tearful presentation, exhibition of guarding, and pain reproduced with movement in the lumber spine. Dr. Hodges noted that because Plaintiff's other modes of treatment – namely epidurals and physical therapy -- had clearly failed, her available options going forward include either a referral for pain management or Plaintiff simply "dealing with her pain."

32.   Dr. Hodges also found her to be a candidate, however, for a fusion at L4-5. Again, she was not able to obtain that surgery because Cigna, her health insurance carrier, denied coverage for it notwithstanding her having two physician recommendations.

33.   In April 2018, after exhausting her short-term disability benefits, Plaintiff filed a claim with the Cato Plan, through Lincoln, for long-term disability ("LTD") benefits under the Plan and policy referenced earlier in this Complaint.

34.   Upon filing her claim, it was noted in her claim record based on information Lincoln had before it which led to the approval of her STD benefit that Plaintiff was "TDOO," an abbreviation that means "totally disabled from own occupation," a nod to the LTD policy requirement that Plaintiff be disabled from her own occupation to qualify for LTD benefits.

35.   However, Lincoln's LTD claims group, facing potentially a longer period of payment to the Plaintiff, found the information supporting Plaintiff's STD to be incomplete when it came to Plaintiff's LTD and conducted an additional investigation that involved looking into Plaintiff's rotator cuff issue that had nothing to do with her original basis for seeing disability benefits.

36.   It also commissioned an internal vocational review upon opening the claim that immediately introduced error into the administration of Plaintiff's LTD claim by ignoring the physical demands the DOT assigned to Plaintiff's occupation under "Manager, Retail

Store."  Instead, Lincoln stopped at the general description of the job itself.

37.    If Lincoln had considered the entire DOT entry and not just that part that in its view favored denial of Plaintiff's claim, it would have considered the fact that this occupation is classified as a "Light" physical demand occupation.  This is significant, because a "light" demand means that the occupation involves the following physical demands necessary to perform the job under the DOT's description:

> L-Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

38.    This vocational review was followed by a medical records review by Dr. Joshua Szabo, a reviewer that Lincoln's vendor Professional Disability Associates employed to help with Lincoln's review of Plaintiff's benefit claim.

39.    Dr. Szabo provided Lincoln with a facially deficient review of Plaintiff's medical information by supplying an "opinion" based on outward expressions of conjecture, not facts, concerning whether Plaintiff could maneuver certain weights or engage in physical activities such as

prolonged standing.   Indeed, Dr. Szabo's report made no factual or objective findings *at all*.

40.   In the meantime, Dr. Hodges saw Plaintiff in July 2018 where she required the use of a cane to ambulate and she reported continuing pain with motion in her lumbar spine.

41.   In a letter dated July 23, 2018, Lincoln eventually informed it after it was terminating and closing Plaintiff's LTD claim because it found that she did not meet the definition of "Total Disability" in her policy.   Specifically, Lincoln concluded that the "medical documentation" in her claim file did not show that she is unable to resume working in her own occupation beyond February 16, 2018. Lincoln paid Ms. Hinton's claim up to that date, then closed it.

42.   This conclusion was based on three errors: (1) reliance on Dr. Szabo's "medical file review" which resulted in a useless report that constituted nothing more than a guess about whether or not Plaintiff could maneuver certain weights or engage in physical activities such as prolonged standing; (2) reliance on a generalized DoT description of Ms. Hinton's occupation with Cato, a national retailer, without giving any consideration to what the requirements of her occupation actually were

12

and which in any event ignored even the DoT's full description of the physical demands of the occupation it ascribed to Plaintiff.

43.   Following the receipt of this decision, Plaintiff retained counsel which requested the immediate production of all "relevant" documents relating to Lincoln's adverse benefit determination based on Department of Labor regulations defining what "relevant" documents include.

44.   Included within that request were Lincoln's claims procedures, but Lincoln did not respond to that part of the request and instead provided documentation it identified as being included in its claim file for the Plaintiff.

45.   After reviewing the actual and complete vocational and medical reviews described above found in the claim record and that were cited in Lincoln's decision letter, Plaintiff submitted to a Functional Capacity Examination ("FCE") to obtain precisely the "objective" observations that Lincoln claimed were lacking in its reliance on Dr. Szabo's unsubstantiated guesses about Plaintiff's physical capacity.

46.   This FCE performed by Bledsoe Occupational Therapy confirmed through objective testing the limitations against prolonged

standing and sitting given previously by Plaintiff's providers and the veracity of Plaintiff's reports.

47. Among other things, the FCE report showed Plaintiff to be unable to lift anything over ten pounds and to be unable to maintain a seated position for more than 39 minutes before needing to rise.

48. It also showed Plaintiff's maximum time to be able to stand on her feet on any single occasion was just 12 minutes. Her testing confirmed her ability to remain standing or to walk as being limited to "occasional", and her ability to sit was likewise limited.

49. This FCE report indicated:

> Patient demonstrated the ability to sit for 39 minutes, which meets the defined norm for FCE testing under the data provided from Fishbain, Et AL (The Clinical Journal of Pain, Vol 15. No. 2, 1999]. However, it would be error to interpret this OT recommendation to mean that patient is capable of maintaining a seated position in a manner necessary to perform a sedentary occupation where sitting throughout the day may be required. After remaining seated for a 30 minute period, patient demonstrated the need to shift and reposition, to relieve observed manifestations of pain.
>
> With such rest breaks included, the results of patient's FCE indicate he cannot be expected to maintain seated position for over 2 ½ to 4 hours each day. The need for multiple recline breaks and her reliable report of next day difficulties indicate that patient is unable to perform a sedentary job.

50. The FCE report was then provided to Plaintiff's medical providers who were asked specifically whether the report was consistent with their own professional medical observations and evaluations of the Plaintiff; the three doctors involved in the care for Plaintiff and her spinal condition all confirmed it was.

51. To remedy Lincoln's patently flawed vocational review, Plaintiff's occupational demands were referred to an independent

vocationalist. This vocationalist confirmed the physical requirements of Plaintiff's occupation were inconsistent with the incomplete statement upon which Lincoln had relied and concluded based on the FCE and confirming professional medical opinions of Plaintiff's attending physicians that Plaintiff was unable to resume working in her former occupation -- or any fulltime occupation at all.

52.    On January 11, 2019, Plaintiff appealed Lincoln's closure of her claim with a submission that included the above-referenced records and reports in addition to updated records from Plaintiff's healthcare professionals.

53.    The claim record for Plaintiff shows Lincoln greeted this Appeal in a shockingly cavalier fashion. Instead of referring the appeal for a review completed by a physician, the appeal was routed to a mere company nurse lacking the education or training of Plaintiff's providers who each are Board certified specialists in their respective fields.

54.    This company nurse issued a self-contradicting report that referred to medical records that reported Ms. Hinton has having an impaired gait and functional limitations that would prevent Ms. Hinton from performing even a "light duty" physical-demand job, yet which

15

proclaimed that "current medical records" fail to demonstrate these very things. This nurse consultant either did not review the records he or she cited, or he or she actively sought to mischaracterize them to support his or her employer's earlier determination.

55. This nurse consultant even went so far as to enthusiastically state that there "is no medical disagreement with [Dr. Szabo's] peer review" when very clearly that was **not** the case given the several physician statements affirming Ms. Hinton's FCE result with Bledsoe Occupational Therapy.

56. In a nod toward the revised Department of Labor regulations enacted in 2018, Lincoln provided Plaintiff with a copy of the report and gave Plaintiff a very short period (which is contrary to the regulations requiring a more meaningful period) to respond to it.

57. Plaintiff did respond (hurriedly given the short period Lincoln granted in which to do so), and pointed out these issues noted above and other problems with the company nurse review to the extent all this person did was parrot Dr. Szabo's many overt and non-objective guesses about what Plaintiff *might* be able to do.

58. Lincoln stubbornly refused to give any consideration or

attention to Plaintiff's response or to the evidence Plaintiff submitted, especially that which directly contradicted its own reviewers, and on February 26, 2019, denied the appeal outright.

59.    At this point, Plaintiff requested an updated production of "relevant" documents that again included a request for Lincoln's claim procedures – which again Lincoln ignored, providing only its self-identified claim file.

60.    Consistent with the Policy's terms allowing for an independent medical examination ("IME") to be performed during the course of a claim administration, Plaintiff submitted to an IME that took place on April 24, 2019.

61.    The IME examiner confirmed that the earlier FCE result was consistent with his own observations and testing -- just like Plaintiff's attending physicians had done.

62.    He further expressed "sharp disagreement" with Dr. Szabo and, by extension, Lincoln's company nurse, and found Dr. Szabo's report to be "unfounded" factually and contrary to Plaintiff's available records and testing.

63.    On May 8, 2019, Plaintiff appealed her denial a second time

as permitted under the Plan, citing this favorable IME result and providing also additional updated medical records showing her problems to have continued.

64.   On June 11, 2019, Plaintiff received notice that Lincoln wished to have a second IME performed with a different physician. It indicated it had scheduled the examination to take place on June 20 – just *two days* before it owed Plaintiff a written decision on her appeal pursuant to Plan terms and Department of Labor regulations allowing for 45 days for such to occur.

65.   Under the amended claims regulation, this request for a redundant IME is both untimely and impermissible sandbagging. The regulation reads as follows:

§ 2560.503-1 Claims Procedure. h(4)

Plans providing disability benefits. The claims procedures of a plan providing disability benefits **will not**, with respect to claims for such benefits, **be deemed to provide a claimant with a reasonable opportunity for a full and fair review** of a claim and adverse benefit determination unless, in addition to complying with the requirements of paragraph (h)(2)(ii) through (iv) and (h)(3)(i) through (v) of this section, the claims procedures

(i) Provide that before the plan can issue an adverse benefit determination on review on a disability benefit claim, the plan administrator shall provide the claimant, free of charge,

with any new or additional evidence considered, relied upon, *or generated* by the plan, insurer, or other person making the benefit determination (or at the direction of the plan, insurer or such other person) in connection with the claim; **such evidence must be provided <u>as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided under paragraph (i) of this section to give the claimant a reasonable opportunity to respond prior to that date</u>;** and

(ii) Provide that, before the plan can issue an adverse benefit determination on review on a disability benefit claim based on a new or additional rationale, the plan administrator shall provide the claimant, free of charge, with the rationale; the rationale **<u>must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided</u>** under paragraph (i) of this section to give the claimant **<u>a reasonable opportunity to respond prior to that date</u>.**

(emphasis added).

66.    Lincoln's decision was due June 22nd, and it was required by regulation to provide a copy of all new evidence and rationales "as soon as possible" and with as much advance opportunity as possible so as to permit Plaintiff to respond if needed by June 22.  Lincoln did not comply with this requirement, and in a letter dated June 14, Plaintiff informed Lincoln of this fact.

67.    On or about the same day Plaintiff sent this letter, Lincoln

belatedly informed that it sought to invoke an extension of its time for rendering a decision, but it cited no *exceptional* circumstances for doing as the Plan and regulations expressly require. The only circumstance it identified was that as of June 12th, it had belatedly decided to schedule a second IME that was duplicative of the IME that occurred that April and of the FCE that occurred before that. Taking too long to administer a claim is not an exceptional circumstance meeting the applicable standard; it is the sort of circumstance the regulations were promulgated specifically to *address* for claimants where each passing day without a decision creates ever more dire financial circumstances.

68.   Plaintiff informed Lincoln with regard to the second IME that she did not consent to the extension in light of Lincoln's failure to comply with the Plan and regulations.

69.   Plaintiff also informed Lincoln that although she would attend the June 20 examination, it would be with without waiver of these issues over its lack of necessity and timeliness. Plaintiff further advised Lincoln that in light of the adversarial circumstances presented by the scheduling of this second IME, she would was invoking her right to have a non-participating representative accompany her to this proceeding for

the sole and exclusive purpose of making a video recording of the examination to ensure her personal safety and to ensure she was treated with fairness by creating a proper record so there would be no misunderstanding as to what her examination involved and revealed.

70.   Lincoln resisted, and suggested that it had an internal policy or procedure that did not allow claimants to make recordings of such examinations.

71.   This was a curious position for Lincoln to have taken for several reasons:

(1)   First, it is inconsistent with Lincoln having expressly represented previously both to the Plaintiff here in response to ERISA production requests and generally in other litigations that it does not maintain any internal policies and procedures for the administration of claims whatsoever.

(2)   Second, Lincoln itself regularly records claimants in all other situations for its own purposes, including through the recording of telephone calls with its claims team (after indicating to callers that their conversations may be recorded) and sometimes through clandestine surveillance by vendors,

so Lincoln clearly does countenance recordings when it supports its own aims.

(3) Any such policy would be inconsistent with practices by other national insurers that regularly permit such recordings to occur, so Lincoln's position taken against Plaintiff is an outlier.

72. On June 22, Plaintiff timely arrived at Dr. Edwin Kelsey's office to submit to the examination as she had indicated to Lincoln and to Network Medical Review (the vendor through which Lincoln scheduled this examination) she would do. Dr. Kelsey declined to move forward with the examination, citing that Lincoln needed to have a representative be present on its behalf also and that he needed to be paid an additional fee for video to be taken. Because Lincoln had not seen to either of these things, he would not proceed.

73. Days later, Lincoln failed to issue a written decision to Plaintiff by June 22nd as her Plan and relevant regulations require.

74. Lincoln's failure to render a timely decision results in a denial of Plaintiff's administrative appeal by operation of law under Department of Labor regulations and Eleventh Circuit precedent, such

that Plaintiff's administrative remedies are deemed exhausted because of Lincoln's clear and persistent failure to adhere to material Plan terms and governing claims regulations.

75.   After Plaintiff's claim both as to LTD and Group Life waiver of premium benefits was deemed denied by operation of law on June 22, Plaintiff informed Lincoln in a letter dated June 23rd that she considered further pursuit of Lincoln's claims process to be futile and that her remedies to have been exhausted under Eleventh Circuit precedent due to Lincoln's failure to adhere to relevant regulations and Plan terms.

76.   Plaintiff has since requested that she be provided with an updated copy of his ERISA administrative record pursuant to 29 C.F.R. § 2560.503-1(h)(2)(iii).

77.   The record known to Plaintiff thus far, having been confirmed by Plaintiff to bear the Bates range "Baker-Hinton 0001 through 2335" establishes numerous breaches and errors committed by Lincoln while administering Plaintiff's different claims, including:

(a)   The failure to maintain adequate claims procedures, or any procedures *at all*, in compliance with Department of Labor regulations;

23

(b)   The targeting of Plaintiff's claims for denial because ERISA governs;

(c)   The failure by Lincoln to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(d)   The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of his claim;

(e)   Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all his claim;

(f)   Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

(g)   Failing to accord any weight to Plaintiff's medical providers and other examiners who personally examined the Plaintiff, some on a regular basis;

(h)   Failing to adhere to the terms of the Plan, including as to those governing the timely issuance of a written claims decision and adherence to amended Department of Labor claims regulations;

(i)   Purposefully limiting and curtailing the review of its medical personnel and otherwise improperly exerting influence on them to opine against payment of benefits;

(j)   Unreasonably and arbitrarily overruling the professionals who personally examined Plaintiff and instead relying on the demonstrably deficient report of a biased and unqualified doctor to perform an incomplete examination; and

(k)   Failing to give Plaintiff's claim a full co-morbid review and give any consideration to how his conditions impacted one another.

78.    Despite Plaintiff's established disability and entitlement to coverage under the terms of the LTD and Group Life Plans, Lincoln determined that Plaintiff was not "disabled" and that she did not qualify for these benefits.

79.    As set forth above in connection with Lincoln's fiduciary breaches, Lincoln's claim decision was the product of a conflict of interest whereby it allowed its own financial interests to supersede its fiduciary obligations to Plaintiff.  Under *Glenn*, this presents an additional reason for application of a *de novo* standard to their claims decision.

80.    This conflict of interest further calls into question the credibility of Lincoln's claims personnel and reviewers.

81.    Lincoln considered the applicability of ERISA before making its decision.  This presents an additional reason for application of a *de novo* standard to their claim decision.

82.    Lincoln did not provide Plaintiff with a meaningful opportunity for a full and fair review of this claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1, and instead actively tried to subvert Plaintiff's ability to protect her right to such a review,

especially in its scheduling of a second IME in an effort to sandbag the Plaintiff.

83.   Lincoln's decision process did not comport with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations.

84.   Plaintiff has exhausted all Plan remedies even though Lincoln's failure to adhere to Plan terms or ERISA requirements and regulations did not require it.  As such, this case is ripe for judicial review.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Glenda Hinton respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.   For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the LTD and Group Life Plans and Policies, as well as all prejudgment interest due thereon

as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b.      For an order requiring Defendant to adhere to Plan terms and Department of Labor regulations incorporated therein;

c.      For a judgment against the Defendant awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1);

d.      For an order requiring Defendant to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan(s); and

e.      Such other relief as may be deemed just and proper.

Respectfully submitted,

M. Clayborn Williams (ASB-9101-A43M)
**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com

**Plaintiff's Address:**

Glenda Hinton
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendants' Address:**

The Lincoln National Life Insurance Company
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104